927 A.2d 468

Scott Lewis **RENDELMAN**

v.

**STATE of Maryland.**

No. 2616, Sept. Term, 2005.

Court of Special Appeals of Maryland.

July 6, 2007.

424

Karen C. Daly (Ronald Machen, Wilmer Cutler, Pickering, Hale & Dorr, LLP, on brief), Washington, for appellant.

Brian S. Kleinbord (Douglas F. Gansler, Atty. Gen., on brief), for appellee.

Panel SALMON, EYLER, DEBORAH S., WENNER, and WILLIAM W. (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

Scott Lewis Rendelman mailed a letter to William Elmhirst threatening to sue him for damages if he did not pay a $100,000 "settlement demand." Rendelman's threat was made in bad faith, with actual knowledge that he had no factual or legal ground for the threatened suit. A jury in the Circuit Court for Montgomery County convicted Rendelman of one count of extortion by economic threat and one count of extortion in writing by economic threat.[1] On appeal, Rendelman challenges the legal sufficiency of the evidence to support his convictions. Finding merit in this contention, we shall reverse.[2]

---

1. The court sentenced Rendelman to the statutory maximum of 10 years' incarceration.

2. Rendelman poses two additional questions, one a challenge to an evidentiary ruling and the other a challenge to the trial court's refusal to give a proposed jury instruction. Because we have resolved the

## FACTS AND PROCEEDINGS

In 1981, Elmhirst hired Rendelman to work as a bookkeeper for his company, Solarquest.[3] Rendelman's duties included reconciling the books of account and paying bills. He was not a financial planner or a certified public accountant, and his job did not involve making investments or handling financial matters other than straight bookkeeping.

Three years later, in 1984, Kevin P. Fay, Elmhirst's lawyer, became suspicious that Rendelman might be embezzling money from the company. Fay reviewed Solarquest's books of account and found 22 checks made out to Rendelman, and ostensibly signed by Elmhirst. The checks totaled $246,000. All the reference lines on the checks bore the notation, "Loan."

As it turned out, Elmhirst knew nothing about the checks and had not authorized any of the so-called "loans." Fay and Elmhirst immediately reported the theft to the authorities, and obtained a court order that, among other things, froze certain of Rendelman's accounts.

On December 20, 1984, Rendelman wrote Elmhirst a long, conciliatory letter, admitting that he had taken the money but explaining that he had invested it in gold coins, mortgages, and notes that (in his opinion) were sound investments for Elmhirst. Rendelman acknowledged that his conduct technically constituted theft but tried to excuse it, saying he had been prescient about the expanding economy and simply had taken it upon himself to make investments for Elmhirst that would be to Elmhirst's benefit. He promised to assign the notes and mortgages to Elmhirst. He offered his resignation and attached a check for $93,496.20.[4] The letter said nothing

---

sufficiency issue in Rendelman's favor, we need not address those questions.

3. The record does not reflect the nature of Elmhirst's business. Although Rendelman refers to it as "Solar Quest" in his letters, it appears in court records as "Solarquest."

4. From the record, we cannot determine whether any of the supposed gold coins, notes, and mortgages existed; if so, whether they were

to suggest that Rendelman thought that Solarquest or Elmhirst owed him money.

The next day, December 21, 1984, Elmhirst, through Fay, filed a civil action for conversion against Rendelman, in the Circuit Court for Montgomery County.

On January 14, 1985, Rendelman brought his own civil action for "return of property" against Elmhirst and Fay, also in the Circuit Court for Montgomery County. By then, his conciliatory tone was gone, and he began sending letters to Elmhirst that were crude and accusatory.

The court consolidated the civil cases. Eventually, Rendelman and Elmhirst entered into a settlement agreement. (The terms of the agreement are not reflected in the record in the instant case.) In December of 1986, Rendelman moved to set aside the settlement agreement. When that motion was denied, he noted an appeal to this Court. His appeal was dismissed administratively, on March 1, 1988, for failure to file a brief.

In the meantime, Rendelman was prosecuted on the felony theft charges in the Circuit Court for Montgomery County. On September 10, 1986, he was convicted on 15 counts. About six weeks later, he was sentenced to 10 years' incarceration, all but 18 months suspended, in favor of three years' supervised probation.

In late 1986, Rendelman stepped up his letter-writing campaign. He sent vitriolic and profane letters to Elmhirst, blaming him for the fact that his wife had divorced him and he was estranged from his young children. He also blamed Elmhirst for the physical and emotional pain he claimed he was suffering in prison. In some of the letters, Rendelman called Elmhirst a liar and a thief, and alleged that Elmhirst owed him $20,000. Over time, Rendelman's letters grew increasingly vulgar and included wishes that Elmhirst and his entire family would die.

---

turned over or assigned to Elmhirst; or whether the $93,496.20 check was negotiated.

All told, Rendelman sent one letter to Elmhirst in 1986; twelve in 1987; and four in 1988. In his third letter in 1988, he announced that he had decided to "play it safe" and stop writing, so he would not jeopardize an early release date. In March 1988 (apparently after being transferred into federal custody), Rendelman sent one more letter to Elmhirst, claiming that he had been raped in prison.

Rendelman also made Fay an object of his letter writing campaign. He sent Fay three letters in 1987 and one in 1988. These letters also were exceedingly vulgar and profane. They included threats to drive Fay's wife and children away from him.

Rendelman finished serving his sentence in the felony theft case in February of 1988. He was released to federal authorities on a pending federal detainer, and began serving a federal sentence.[5]

On December 21, 2001, Rendelman finally was released from prison and began his three year period of supervised probation.

Exactly three years and one day later, on December 22, 2004, Rendelman sent a letter to Elmhirst, the first since 1988. The letter is typed and bears a letterhead with Rendelman's name and an address in Sacramento, California. Rendelman mailed a copy of the letter to Fay. The December 22, 2004 letter ("Letter") is the basis for the extortion convictions in the case at bar.

---

**5.** The record does not reflect the nature of his federal conviction. Public records reveal that, in 1988, Rendelman was convicted in federal court on seven counts of mailing threatening letters, in violation of 18 U.S.C. section 876. The letters were mailed to Elmhirst, the attorney who prosecuted the felony theft case, and certain appellate judges. *United States v. Rendelman,* 968 F.2d 1213, (4th Cir.1992) (unpublished table decision), No. 91–5671, 1992 WL 172095, at # 1.

Public records further reveal that, around 2003, Rendelman was convicted in a California federal court of issuing threats against the President of the United States. *United States v. Rendelman,* 62 Fed. Appx. 143 (9th Cir.2003) (unpublished table decision), No. 02–10004 2003 WL 1793303, at *1.

One only can fully appreciate the contents and flavor of the Letter by reading it in its entirety. We set it forth with the most exceptionally profane vulgarities deleted:

William K. Elmhirst, you filthy [expletives],

I've waited 20 years to write this letter. It was December 24, 1984, almost exactly 20 years ago, when you froze my bank accounts, ruined my Christmas with my family, and started the process that would put me in prison for 17 years. You're a [expletives] piece of dog shit. Thanks to you, my kids grew up without a father and my wife (or should I say my ex-wife) is a widow. [Expletives] I hate your guts. You will *NEVER* be able to give me back my lost years, return me to father my 6 and 2 year old kids, or give me back my wife. My life is ruined and it's all your doing. You made false claims against me, stole my money, and you don't give a shit. The only thing you could do is give me back my money. That won't make everything right again, but it's the best you can do. It's the only thing you can do.

I was released on December 21, 2001, and I've been on three years parole. During that time I was not allowed to contact you, I was not allowed to travel, and I couldn't change my residence. But now I am off of parole. Now there is nothing stopping me from coming back there. **NOTHING!!** You stole about $22,000 from me. It was actually a little more, and yes, I still have the exact amount in my records which have been sent to a third party who has kept them for me all these years. I can look it up if it becomes necessary, but for the purpose of settlement, let's just say it was $22,000. Twenty years at 9% compounded interest makes the current amount due $123,297.04. I will settle for $100,000 even. This is the amount I want. You give me back my money, and I swear, you will never see or hear from me again. I will take the money and leave this stinking fucking country and the United Fucking States can kiss my ass goodbye. This country breaks up families, puts innocent people in prison without fair trials, and no one cares. Well, fuck all you people. This is the wrong country

to marry in and raise a family in. My son is in the army and is in Iraq and the government will probably have him killed and I never knew him beyond the age of 6 years old. Fuck all of you. Give me my money and I'm gone.

But if you don't give me my money, I swear, I will come back there and I will knock on your front door. I will demand my money, and if you refuse, I will sue you, and I will sue you for the entire $123,297.04. I will make your remaining years of your life miserable. I will sue you, I will file liens on your property, I will have the sheriff seize your assets. Don't think the statute of limitations will help you. I remember from my legal research that the time of the statute of limitations is tolled while I am involuntarily out of the state, and I have been involuntarily out of the State of Fucking Maryland since 1988. The statute didn't start running again until today. The way I figure, I still have another year to file on you, but I'm not going to wait that long. I will give you one, maybe two months, and if I don't have my money back, I will come back. I will quit my dead end job and move out of my one room studio and I will come back. I will find you. If I have to hunt for you door to door, I will find you, and when I find you, I will sue you. How old are you now, about 76? 77? I don't even know if you're still alive, but if you are, I **WILL** find you. If you're dead, I will search for your heirs, and when I find them, I will demand my money from them, because they did not inherit your money. It was *MINE!!!!* I will demand my money from them, and if they refuse, I will sue them. I will sue them and get my money, and then I will leave this stinking country and never come back. [Expletives].

I want my money sent to me at the above address. If I do not hear from you, I will return. I will come to your house and look you in the eye. Don't think this is over. Far from it. It's just starting. All these years, you got away with it because I was locked up. I lost cases because I could not print copies of my appeal brief, I could not research State of Fucking Maryland issues in federal prisons on the other side of the fucking country, and I did not

have access to my records. Well, all that changes. Now, you will never again win a case by my default. I will prosecute all my cases fully and to the end. You will not win by default. You will either give me back my money, or you will spend at least as much in legal fees trying to illegally keep it. Either way, God will not let you profit from what you did to me and my family. [Expletives]. How can you sleep at night and look yourself in the mirror in the morning? ? ? You don't care. You ruined a man's life for what was a puny $22,000 which made no difference in your lifestyle at all. You did it just for the fun of it, didn't you? ? I stole nothing from you. *YOU* are the thief. *YOU* are the menace to society. Its [sic] people like you who make society the shit that it is. You break up families and [expletives].

You [expletive]. All you had to do was come to my sentencing and say a few words on my behalf like Kevin P. Fucking Fay said you would do to get me to settle the civil suit with you. If you had done it, you would never have heard from me again. But you didn't, and you cost me 20 years of my life. Now, it's not over. Now I want my money back, and if you don't give it to me, I will make you wish you had come to my sentencing like you promised. I will sue you, I will file liens on your house and Solarquest property, and I will have the sheriff seize your assets. You will pay. You will pay $100,000 or your remaining years will be spent paying legal fees and going to court when I sue you for $123,297.04.

By the way, Merry Fucking Christmas you [expletives].

I'm sending a copy of this letter to Kevin Fay. I may sue him too for being a fucking piece of shit.

(Emphasis in original.) The appellant signed the Letter.

In fact, Elmhirst still was alive, but had moved to England. He never received the Letter (or any letters sent by Rendelman subsequent to that date).

On February 8, 2005, Rendelman wrote another letter rife with vulgarities to Elmhirst, also copied to Fay. Finally, on March 14, 2005, Rendelman wrote to Fay directly.

On April 19, 2005, Rendelman appeared, unannounced, at Fay's law office in Montgomery County. He identified himself to the receptionist and asked to speak to Fay. The receptionist told him that Fay was not in at the moment, but he was welcome to wait. Rendelman took a seat in the reception area. Fay and his office workers, apparently concerned that Rendelman might come to the office and cause trouble, had devised an emergency plan, in case Rendelman appeared. In accordance with the plan, the receptionist notified Fay's secretary, who called 911; and the receptionist also activated a silent alarm under her desk.

Fay, unaware of Rendelman's presence, arrived at the office from a lunch meeting. He walked into the reception area and saw Rendelman. He greeted Rendelman and said he would speak to him in a moment. Rendelman agreed. Shortly thereafter, the police arrived and arrested Rendelman on an outstanding warrant. (The record does not reflect the nature of the warrant.)

On June 17, 2005, Rendelman was indicted on eight counts of extortion. In counts I and II, he was charged with extortion of Elmhirst, by means of the Letter. Count I charged extortion by written threat of economic harm; and count II charged extortion generally, by threat of economic harm and damage to property. In the other counts, all of which were either disposed of on a motion for judgment, or resulted in not guilty verdicts, Rendelman was charged with extortion of Fay, by the Letter and others that followed it.[6]

---

6. Those counts were charged as follows: count III—extortion by writing, based on copy of Letter to Fay; count IV—extortion generally, based on copy of Letter to Fay; count V—extortion by writing, based on February 8, 2005 letter to Fay; count VI—extortion generally, based on February 8, 2005 letter to Fay; count VII—extortion by writing, based on March 14, 2005 letter to Fay; count VIII—extortion generally, based on March 14, 2005 letter to Fay.

The extortion charges were tried to a jury on October 31 and November 1, 2005. The State called two witnesses: Fay and his receptionist. Rendelman did not testify on his own behalf and did not introduce any evidence. As we have explained above, the jury convicted Rendelman on counts I and II, extortion by writing and extortion generally of Elmhirst, based upon the Letter.

## DISCUSSION

### Maryland Law of Extortion

The word "extortion" has its root in the Latin *"torquere,"* which means to wrench or twist. MERRIAM WEBSTER COLLEGIATE DICTIONARY at 444 (11th ed.2003). *See also* RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, at 1998 (2d ed.1987) (noting that the word "torque" also has the Latin root *torquere,* but is derived more recently from the French); Stanley S. Arkin, *Blackmail and the Practice of Law—Part I,* *N.Y.L.J.,* Feb. 7, 1995, at 3 (observing that the derivation of "extortion" is the French word "torque").[7] Common law extortion, a misdemeanor, was a first cousin of the crimes of bribery and misconduct in office. Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 538 (3d ed.1982) (stating that "[t]he dividing line between bribery and *extortion* is shadowy." (emphasis in original)). It was a limited crime that prohibited the corrupt collection by an officer of an unlawful fee, under color of office. *Iozzi v. State,* 5 Md.App. 415, 418–19, 247 A.2d 758 (1968).

Beginning in the 19th century, many states enacted extortion statutes to criminalize conduct that was extortionate but did not fall within the ambit of the narrow crime of common law extortion. Generally, "statutory extortion," which may be committed by private people as well as by public officials, is "[t]he act or practice of obtaining something or compelling some action by illegal means, as by force or coercion."

---

7. The word "torture" comes from the same Latin root. MERRIAM WEBSTER, *supra,* at 1320.

BLACK'S LAW DICTIONARY 623 (8th ed.2004). "Blackmail," which is the act of obtaining money or something of value upon threat of disclosing incriminating or embarrassing information, even if true, is a subset of extortion. Arkin, *supra*, at 3.[8]

In the late 1800's, the Maryland General Assembly enacted two extortion statutes.[9] In 1972, a third statute, prohibiting coercing or intimidating another to contribute or donate money or property to a social, economic, or political association or organization, was enacted. Ch. 721, Laws of 1972.

■ Maryland's general extortion statute, presently codified at Md.Code (2002, 2006 Supp.) section 3–701 of the Criminal Law Article ("CL"), was enacted in 1978, and remains substantively unchanged.[10] *See* "Revisor's Note" to CL

---

**8.** "Blackmail" as a term came into frequent use in 16th Century Scotland, to denote payments exacted by robbers in exchange for protection. Arkin, *supra*, at 3.

**9.** By Chapter 98 of the 1890 Laws of Maryland, the General Assembly enacted Art. 27, section 397, which made it a misdemeanor for any person, with the intent to extort money or gain profit, to falsely accuse or threaten to accuse another of a crime, or of anything which, if the accusation were true, would tend to bring the person into contempt or disrepute. That statute appeared at section 563 of Article 27, when the Criminal Code was recodified into the Criminal Law Article in 2002. By Chapter 396 of the 1896 Laws of Maryland, the General Assembly enacted a second statute outlawing threats, that made it a felony to verbally threaten or accuse any person of an indictable crime or of anything which, if true, would bring the person into contempt or disrepute; or do any injury to the person or property of anyone, with a view to extort or gain any money or thing of value. That statute appeared at section 562 of Article 27.

**10.** During the 2006 session, the legislature enacted SB 606, entitled "Human Trafficking, Extortion, and Involuntary Servitude." SB 606, which will take effect October 1, 2007, amended CL section 3–701 to read as follows:

(b) A person may not obtain or, attempt to obtain, **or conspire to obtain** money, property, **labor, services,** or anything of value from another person with the person's consent, if the consent is induced by wrongful use of actual or threatened:
 (1) force or violence, or by;
 (2) wrongful threat of economic injury; **or**

§ 3–701; *see also* Ch. 449, Laws of 1978. It punishes the extortive threat, not the actual attainment of money (or thing of value). *See Iozzi v. State, supra,* 5 Md.App. at 419, 247 A.2d 758 (construing former Art. 27, section 562, governing verbal threats); *see also* 3 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 20.4 (2d. ed.2003). It provides, at subsection (b):

> A person may not obtain or attempt to obtain money, property, or anything of value from another person with the person's consent, if the consent is induced by wrongful use of actual or threatened force or violence, or by wrongful threat of economic injury.

The statute excepts "legitimate efforts by employees or their representatives to obtain certain wages, hours, or working conditions." CL § 3–701(a). No Maryland appellate case has interpreted or applied the phrase "wrongful threat of economic injury."

■ CL section 3–706 more specifically prohibits "Extortion by written threat." Presently (and when Rendelman mailed the Letter), that statute states, in pertinent part:

> (b) A person, with intent to unlawfully extort money [or thing of value] . . . may not knowingly send or deliver . . . a writing threatening to:
>
> (1) accuse any person of a crime or of anything that, if true, would bring the person into contempt or disrepute; or
>
> (2)
>
> (i) cause physical injury to a person;
>
> (ii) inflict emotional distress on a person;
>
> *(iii) cause economic damage to a person; or*
>
> *(iv) cause damage to the property of a person.*

(Emphasis added.) This statute, like CL section 3–701, criminalizes the making of the threat; it is not necessary that the

---

**(3) destruction, concealment, removal, confiscation, or possession of any immigration or government identification document with intent to harm the immigration status of another person.**

(New language in bold; deletions indicated by strike outs.)

extortionist have obtained the money or thing of value to have committed the crime. The crime is complete upon the sending or delivery of the threatening writing. LAFAVE, *supra*, at § 20.4. The predecessor statute to CL section 3–706, prior to the 2002 recodification, was Article 27, section 561.

The word "unlawfully" was added to subsection (b) of CL section 3–706 by Acts of 2004, ch. 117, § 1, effective October 1, 2004. In the immediately prior version of subsection (b), which took effect on October 1, 2002, the *mens rea* of the crime was the "intent to extort money ..." The 2004 amendment inserted the word "unlawfully" to "clarif[y] that the crimes of extortion by false accusation or threat of verbal or written extortion requires the extortion to be 'unlawful.'" Senate Judicial Proceedings Committee, Floor Report on Senate Bill 353 (2004).

Another amendment in 2004 added subsections (b)(2)(iii) and (iv). Before then, the *actus reus* of the crime was broadly described in subsection (b)(2) as threatening to "injure the person or property of anyone." The Criminal Law Article Review Committee noted that it was not clear whether "injur[y to] the person or property" included economic injury to the victim. Ch. 26, Laws of 2002 at 297. The 2004 amendments answered this question by specifying that threatening to cause economic damage to a person is an act of extortion.[11]

 CL section 3–706(a)(2) includes an exception, for "good faith reasonable notice of dishonor and warning of criminal prosecution under Title 8, Subtitle 1 of this article given by a holder of an instrument to the maker of the instrument."[12]

---

11. The amendment also specified that a threat to "inflict emotional distress on a person" is an extortionate threat.

12. The State argues that the fact that threats to use legal process are not carved out as an exception to CL sections 3–701 or 3–706 (while other threats are excepted) is evidence that the legislature intended such threats to be covered. The cited authority for this proposition is in the civil arena, however, and is inapposite. Criminal statutes are construed narrowly and courts "will not extend punishment to cases

There likewise are no Maryland appellate cases interpreting CL subsections 3–706(b)(2)(iii) or (b)(2)(iv). Moreover, none of the reported cases about convictions for extortion under the Maryland predecessor statutes are directly relevant to our inquiry.

### *Federal Hobbs Act*

■ When the General Assembly enacted the Maryland general extortion statute in 1978, it patterned the legislation after the Hobbs Act, 18 U.S.C. § 1951 (2000), according to a memorandum in the bill file. The Hobbs Act, enacted in 1946, makes it a federal crime to affect commerce "by robbery or extortion," or by attempting or conspiring to do so. 18 U.S.C. § 1951(a). As pertinent to the case at bar, "extortion" under the Hobbs Act is,

> the obtaining of property from another, with his consent, induced by *wrongful* use of actual or threatened force, violence, or *fear* . . . .

18 U.S.C § 1951(b)(2)(emphasis added.) [13] To convict a defendant of extortion under the Hobbs Act, the government must show that he engaged in one of the statutorily identified means to obtain or attempt to obtain property: actual or threatened force, violence, or fear; and that his conduct affected, or was intended to affect, interstate commerce. *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York*, 808 F.Supp. 213, 231–37 (S.D.N.Y. 1992), *aff'd*, 99 F.3d 401 (2nd Cir.1995).

---

not plainly within the language used." *See, e.g., Tapscott v. State,* 343 Md. 650, 654, 684 A.2d 439 (1996).

**13.** The Hobbs Act also criminalizes at 18 U.S.C. section 1951(b)(2) the obtaining (or attempt to obtain, or conspiracy) of property "under color of official right," which is a special breed of extortion that harkens back to common law extortion. *United States v. Cerilli,* 603 F.2d 415, 425 (3rd Cir.1979). Because this type of extortion is not at issue in the case at bar, we shall not reference it in our general discussion of the Hobbs Act.

**438**

 The word "wrongful" in subsection 1951(b)(2) modifies all of the language that follows it, not just the phrase "actual or threatened force." *United States v. Enmons*, 410 U.S. 396, 399, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). Thus, in a Hobbs Act extortion prosecution based upon threats that would instill fear, the defendant must have engaged in the wrongful use of fear or threats that would place the victim in fear. Also, the word "wrongful" in the statute "limits [its] coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." *Id.* at 400, 93 S.Ct. 1007. *See U.S. v. Buffey*, 899 F.2d 1402, 1403 (4th Cir.1990) (including the wrongful use of actual or threatened force, violence, or fear, or under color of official right, as an element of extortion under the Hobbs Act).

Federal courts have interpreted the Hobbs Act to mean that the "fear" element of extortion can be satisfied by proof of acts by the defendant that were designed to put the victim in fear of economic loss. *See, e.g., DeFalco v. Bernas*, 244 F.3d 286, 313 (2nd Cir.2001), *cert. denied,* 534 U.S. 891, 122 S.Ct. 207, 151 L.Ed.2d 147 (2001); *United States v. Sturman,* 49 F.3d 1275, 1281 (7th Cir.1995); *United States v. Bucci,* 839 F.2d 825, 827–28 (1st Cir.1988). In this type of prosecution, the government's burden of proof is satisfied by evidence that the victim was put in fear of economic harm and that the fear was reasonable under the circumstances. *United States v. Billups,* 692 F.2d 320, 330 (4th Cir.1982), *cert. denied,* 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 93 (1983); *United States v. Iozzi,* 420 F.2d 512, 515 (4th Cir.1970), *cert. denied,* 402 U.S. 943, 91 S.Ct. 1607, 29 L.Ed.2d 111 (1971). *See also United States v. DeLuca,* 17 F.3d 6, 9–10 (1st Cir.1994); *United States v. Garcia,* 907 F.2d 380, 381 (2nd Cir.1990).

 Regardless of the type of extortion alleged under the Hobbs Act, specific intent must be proven, *i.e.*, it must be shown that the defendant acted with the intent to compel the victim to part with his property. *United States v. Boylan,* 898 F.2d 230, 253 (1st Cir.1990); *United States v. Smith,* 631 F.2d

103 (8th Cir.1980) (*per curiam* ). When the charge is attempted extortion under the Hobbs Act, the proof required is that the defendant have acted with the specific intent to instill fear in the victim that would compel him to part with his property. *United States v. Marsh*, 26 F.3d 1496, 1500–01 (9th Cir.1994).

Several federal courts of appeal have considered the question whether a threat to file a lawsuit if a settlement demand is not paid is "extortion" under the Hobbs Act. Some of these cases are appeals of criminal convictions under the Hobbs Act. *See United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002). Most are appeals in civil actions under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. section 1961 *et seq.* Section 1962(c) of RICO prohibits "racketeering activity," for which the crime of extortion can be a predicate. *See* 18 U.S.C. § 1961(1)(A) (defining racketeering activity "to include extortion").

██ It is clear, and the cases so hold, that when the threat of litigation has some legitimate basis, *i.e.,* the person making the threat has a colorable legal claim of entitlement to damages, the conduct is not extortion. *See United States v. Kattar*, 840 F.2d 118, 123 (1st Cir.1988) (stating that, when one person threatens to sue another in an effort to persuade the other to honor a contract the first person believes has been breached, there is no Hobbs Act violation); *see also United States v. Sturm*, 870 F.2d 769, 773 (1st Cir.1989) (holding that use of "legitimate economic threats" to obtain property to which one has a claim of right cannot be wrongful under the Hobbs Act).

Even when the threat of litigation absent settlement is made in bad faith (that is, when the threatener knows that he has no legal claim or entitlement to damages), a strong majority of federal courts have held that the threat likewise is not "extortion" under the Hobbs Act. *United States v. Pendergraft, supra,* is most instructive.

In *Pendergraft,* the defendant/doctor operated an abortion clinic in Marion County, Florida. He sued the sheriff's department and the county, in federal court, alleging that they

had violated certain laws by denying his request to hire off-duty police officers to protect the clinic. The county asked the doctor to voluntarily dismiss it from the case, because it had not participated in the decision to disallow the request. The doctor refused, and instead threatened to amend his complaint to add a count alleging that a county official had threatened violence against the clinic, in violation of federal law; and to seek actual and punitive damages and fees and costs for the violation. The doctor then offered *not* to so amend his complaint if the county would pay a monetary settlement.

The doctor alleged that the threat of violence had been made in a telephone call that took place when his business partner and the county official were in negotiations (ultimately unsuccessful) to sell the clinic building. In support, he furnished unsigned affidavits by those claiming to have personal knowledge that the county official had threatened violence in these calls. The doctor did so without knowing, however, that during the negotiations the FBI had been called in and had recorded the telephone calls. The FBI recordings established conclusively that the county official had not made any threats whatsoever. Thus, the affidavits submitted by the doctor were demonstrably false.

The doctor was charged, *inter alia*, with extortion under the Hobbs Act. In essence, he was accused of using interstate commerce in an effort to "shake down" the county by threatening to sue it for damages (by amending his complaint), unless the county paid a settlement. The doctor was convicted.

The Eleventh Circuit reversed. It held that to prove extortion under the Hobbs Act the government must show that the defendant used, or attempted to use, a *wrongful means* to achieve a *wrongful end*. The court determined that, although the government had proven that the doctor had sought to achieve a wrongful end (to get money he was not entitled to, given that the county official had not made the alleged threats of violence), it did not prove that he used a wrongful means. Specifically, the means the doctor threatened to use to pursue

the money—civil litigation—was not wrongful. Therefore, the defendant's actions did not constitute extortion.

In so concluding, the Eleventh Circuit reasoned that tort claims for abuse of process and malicious prosecution provide remedies for frivolous lawsuits. It expressed particular hesitancy to extend criminal liability to a threat of litigation when a governmental entity was the target of the threat. This was so, the court reasoned, because "the right of citizens to petition their government for the redress of grievances is fundamental to our constitutional structure." *Id.* at 1207.

The Eighth Circuit reached a similar conclusion in *I.S. Joseph Co., Inc. v. J. Lauritzen A/S*, 751 F.2d 265 (8th Cir.1984), although in a civil RICO context. In that case, a ship lessee's parent company ("Parent") brought a RICO action against certain shipowners, alleging that they had engaged in extortion, in violation of the Hobbs Act. Specifically, the Parent alleged that the shipowners had threatened to sue it, and to sue a bank with which it had a loan agreement, if it did not pay its subsidiary's debt or inject new capital into the subsidiary. The district court dismissed the claim, ruling that the conduct alleged could not constitute extortion.

On appeal, the Eighth Circuit affirmed. In construing the definition of extortion in 18 U.S.C. section 1951, it reasoned as follows:

> [T]he [Parent's] argument is that the threat of suit against the [b]ank amounted to the infliction of "fear" within the meaning of the criminal statute prohibiting extortion. The purpose of the threat, [the Parent] says, was to frighten it into paying or guaranteeing the debts of [the subsidiary], in order to avoid a disruption of its relationship with the [b]ank. We cannot agree that the threat alleged here constituted the infliction of "fear" for purposes of the extortion statute. We assume for purposes of argument [ ] that the threat to sue was groundless and made in bad faith. Such conduct may be tortious under state law, but we

decline to expand the federal extortion statute to make it a crime.

*I.S. Joseph Co., Inc., supra,* 751 F.2d at 267.

*See also Vemco, Inc. v. Camardella,* 23 F.3d 129, 134 (6th Cir.1994) (noting that "[a] threat of litigation if a party fails to fulfill even a fraudulent contract ... does not constitute extortion"); *DIRECTV, Inc. v. Cavanaugh,* 321 F.Supp.2d 825, 834–35 (E.D.Mich.2003) (observing that "[g]enerally a threat to file a lawsuit, even if made in bad faith, does not constitute extortion"); *G–I Holdings, Inc. v. Baron & Budd,* 179 F.Supp.2d 233, 259 (S.D.N.Y.2001) (holding that threats of pursuing "economically ruinous litigation" were not a RICO predicate because even "threats of meritless litigation or the actual pursuit of such litigation" are not extortion under the Hobbs Act); *Heights Cmty. Congress v. Smythe, Cramer Co.,* 862 F.Supp. 204, 207 (N.D.Ohio 1994) (holding that a "threat to sue unless an individual agrees to a settlement" is not extortion under the Hobbs Act and is thus not a predicate act for RICO purposes); *American Nursing Care of Toledo v. Leisure,* 609 F.Supp. 419, 430 (N.D.Ohio 1984) (threat of litigation is not a predicate act under RICO).

By contrast, in *Hall American. Ctr. Assoc. Ltd. P'ship v. Dick,* 726 F.Supp. 1083 (E.D.Mich.1989), the court held that a threat of litigation is extortion under the Hobbs Act so long as the object of the litigation is shown to have been wrongful, *i.e.,* that the party making the threat knew, at the time, that he was not entitled to the damages sought. *See also United States v. Sturm, supra,* 870 F.2d at 774 (suggesting, hypothetically, that a threat of litigation could constitute extortion under the Hobbs Act upon proof that the person making the threat knew he was not entitled to the damages he was threatening to sue for).

### *Analysis*

The standard of review of the sufficiency of the evidence to support a criminal conviction is whether, on the facts in evidence, viewed most favorably to the State as the prevailing party, any reasonable jury could find all of the

elements of the crime, beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Smith,* 374 Md. 527, 534, 823 A.2d 664 (2003).

The evidence most favorable to the State in the case at bar established that Rendelman had no colorable cause of action for damages against Elmhirst. Rendelman was found guilty of felony theft against Elmhirst, beyond a reasonable doubt; and the two men filed civil actions against each other, which were consolidated and fully and finally settled. Rendelman admitted in his first letter, on December 20, 1984, that he embezzled from Elmhirst's business. Later letters in evidence showed that Rendelman was obsessed with hatred for Elmhirst and Fay, whom he blamed for his criminal theft convictions and for the 10 year sentence the court imposed; but that there was no factual basis to any assertion he ever made, at any time, that Elmhirst owed him money.

The evidence further showed that Rendelman's demands upon Elmhirst were carefully calculated, both in their timing and nature. As Rendelman acknowledged in the Letter, he waited precisely three years and one day after being released from prison to write to Elmhirst, so as not to violate his probation. In demanding a "settlement," Rendelman computed to the penny the exact amount of his bogus damages claim.

The evidence also showed, however, that as vulgar and obnoxious as Rendelman's Letter was, it did not contain any threat, express or implied, to physically harm Elmhirst or to cause him emotional distress (neither of which were charged crimes), or to damage Elmhirst's property.[14] The sole threat (express or implied) by Rendelman in the Letter was to sue Elmhirst and use the processes the civil justice system makes available to enforce his claim, unless Elmhirst paid a $100,000 "settlement demand." We are persuaded that that demand,

---

14. The extortion charge under CL section 3–706 included an allegation that Rendelman made threats of economic harm and property damage. There was no evidence, however, that Rendelman ever threatened to harm property belonging to Elmhirst (or Fay). That aspect of the charge was not pursued, and is not a topic in this appeal.

although made in bad faith, did not constitute extortion by threat of economic damage, within the meaning of CL section 3–701 or 3–706, as a matter of law.

■■■ As discussed above, CL section 3–701 in pertinent part prohibits attempting to obtain money from another person, with his consent, "if the consent is induced by ... wrongful threat of economic injury." Because CL section 3–701 was patterned after the Hobbs Act, and there is a dearth of Maryland case law on the meaning of the statute's "wrongful threat" language, the federal cases interpreting similar language in the Hobbs Act are persuasive authority. We agree with the reasoning of the clear majority of the federal courts in holding that a threat to file suit unless a settlement is paid, even when made in bad faith, is not a "wrongful" threat.

A civil action is a lawful means for people to have their private disputes, including financial disputes, decided when they are unable to decide them on their own. Obviously, it is preferable that disputes be resolved lawfully, through litigation, than by resort to the "rough justice" of fistfights, retaliation, and other street solutions to disagreements.

The usual demand letter (which, to be sure, Rendelman's December 22, 2004 letter was not) serves notice to a potential defendant that the potential plaintiff plans to pursue litigation, unless the underlying dispute can be privately resolved, by an agreement to pay money or other legitimate consideration. If the dispute is not resolved privately, and suit is filed, it is routine that as the case develops through discovery, the plaintiff again will make demands for settlement that, in effect, are statements of his intention to continue the litigation through trial unless the parties agree to a payment that will resolve their dispute.

Settlement demands of this sort are overtures to negotiation, not threats to inflict economic injury. The action "threatened" is to place the dispute in the hands of those lawfully empowered to resolve it, in a civil justice system that, for actions at law, uses money as the medium of exchange.

Thus, a threat that litigation will be initiated, or will be continued, to resolve a dispute, unless money is paid in settlement of the dispute, cannot be a wrongful means to obtain or attempt to obtain money, at least when a claim actually exists.

The same reasoning applies even when the threat of litigation is made in bad faith, with knowledge that there is no genuine claim. The extortionist uses intimidation to leverage gain. Intimidation can be achieved only when the victim reasonably believes (or, if the threat actually would have been communicated to him, reasonably would have believed) that the extortionist has the power to inflict harm (bodily injury, property damage, emotional injury, or economic injury). In other words, the nature of the threat must be such as to make the victim susceptible of being placed in fear of harm.

For example, in *United States v. Iozzi, supra,* 420 F.2d 512, the defendant used his position as president of an association of local building trade unions in Baltimore to foster the impression, in the minds of general contractors, that he had the power to control labor and thereby to slow down or stop construction projects. He made it known to the contractors that they could avoid suffering the financial loss that labor shortages would bring by paying him money. Whether Iozzi in fact had the power he fostered did not matter; the perception of power he created was sufficient to make the contractors reasonably believe that he could affect them financially, and thus to instill fear that they would suffer economic loss if they did not accede to his demands.

Iozzi's objective was wrongful (to gain money he was not entitled to), his means was unlawful (threatening to interfere with labor availability), and because he appeared to have the power to carry through on his threat, he could use it to intimidate. His perceived power gave intrinsic extortionate value to his threats. Likewise, threats to cause physical injury, emotional injury, or property damage, and threats to expose damaging information, even if true (blackmail), have

■■■■■■■■■■■■■■■■

intrinsic extortionate value, as the extortionist has the power (or perceived power) and control to carry out the threat.

■■■ By contrast, a threat to bring civil litigation does not have intrinsic extortionate value. The threat is to place the extortionist's claim against the victim in the hands of a neutral third party, the civil justice system, to decide. The threat is not such as to instill fear because, if it is carried out, the extortionist no longer has the power to affect its result. Without the capacity to instill fear, the threat, in and of itself, does not have the force to leverage payment of value from the victim merely to avoid a consequence.[15]

The State argues that, because the evidence showed that Rendelman's threats "had a wrongful purpose," in that he had no valid claim for redress, then his use of an otherwise proper vehicle (litigation) to accomplish that purpose also would have been wrongful. We are not persuaded by this argument, for the reasons we have just explained. A wrongful purpose does not necessarily make the means threatened to accomplish it wrongful. The means threatened must be of a sort that will instill fear, and therefore produce coercion. The threat of litigation, being a lawful means in which a third party assigned by government to decide disputes will decide that very dispute, is not such a means.[16]

---

**15.** By contrast, a threat to bring criminal charges unless money or value is paid, even if the charges would be well-based, is a blackmail species of extortion.

**16.** The cases the State relies upon are inapposite. It quotes *United States v. Hyde,* 448 F.2d 815, 833 (5th Cir.1971), for the proposition that "[i]t is the wrongful use of an otherwise valid power that converts dutiful action into extortion. If the purpose and effect are to intimidate others, forcing them to pay, the action constitutes extortion." That case involved the "under color of official right" breed of Hobbs Act extortion. The Attorney General of the State of Alabama, his top assistant, and his close business associate threatened certain insurance companies that legal action would be taken against them to prohibit their continuation in business, unless they made payments. In affirming the extortion convictions, the court made the observation quoted above, and then said, "It is the right to impartial determination of the issue on the merits ... that the victim is deprived of when these actions [by officials] are taken for the purpose of coercing him into paying. The

distinction from bribery is therefore the initiative and purpose on the part of the official and the fear and lack of voluntariness on the part of the victim." *Id. In* the case at bar, the threat is to bring legal action that would be determined on its merits by the proper authority—a neutral judge or jury—not by a corrupt official.

In *United States v. Kattar, supra,* there were multiple threats of physical harm, property damage, and economic harm. The defendant agreed to provide the Church of Scientology damaging information about a person who had ongoing litigation against the Church and was viewed by Church authorities as its "enemy." The defendant knew that the information was not true and would be used against the "enemy." The Church made a partial payment to the defendant and, when the information he turned over was unimpressive, refused to pay him the balance. The defendant threatened to give negative information about the Church to the "enemy" to be used against the Church in the litigation, to the Church's economic disadvantage, if the Church did not pay him the balance. In fact, the Church had been cooperating with the FBI. In a trial on charges of fraud and extortion, the defendant argued that he had a legitimate claim to the unpaid balance, and therefore his efforts to obtain it by threatening means could not be extortion. The court rejected that argument, observing that the defendant knew that the information he had promised the Church, whether or not true, was going to be used for illicit purposes and therefore there was no legitimate contract between the defendant and the Church.

Finally, the State cites to a concurring opinion in *State v. Ashley,* 108 N.M. 343, 772 P.2d 377 (1989). In that case, the proprietor of a health club in Albuquerque sought an investor to help him purchase the building in which he leased space for his business. The defendant claimed he could raise the necessary funds, but told the proprietor that he needed $3,500 immediately for a trip to the Bahamas to "meet with his people." When the proprietor refused to pay, the defendant threatened to purchase the property and evict the proprietor once the transaction was completed. After the proprietor contacted the police, the defendant, who was on probation at the time, was charged with extortion and had his probation revoked. He appealed the revocation, arguing that there was insufficient evidence to support the court's finding that he committed extortion.

The majority affirmed the revocation, holding that a threat to forcibly evict a tenant was a "threat of 'unlawful injury' " under the New Mexico extortion statute because it constituted a tort. *Id.* at 347, 772 P.2d 377. The majority declined to address the issue of whether a threat "just to sue for eviction" could be extortion because the defendant had not threatened litigation; rather, he had threatened to "run [the proprietor] out." *Id.* at 345, 772 P.2d 377.

In the concurring opinion relied upon by the State in the instant case, Judge Apodaca argued that a "wrongful[ ] threat[ ] to do a lawful act clearly falls within the statutory definition of extortion." *Id.* at 347, 772 P.2d 377. The statute at issue punished threats made with the "intent ... to wrongfully obtain anything of value" and provided examples of such threats, including "a threat to do unlawful injury to the person or property" of another. *Id.* at 344. Judge Apodaca reasoned that the wrongfulness of the intent controlled the inquiry; in

**448**

We conclude for the reasons we have discussed that a threat to sue, even if made in bad faith, is not "wrongful" within the meaning of Maryland's general extortion statute, CL section 3–701.[17]

---

other words, so long as the ends are wrongful, the wrongfulness *vel non* of the means is of no moment. For the reasons discussed, *supra,* we do not find the reasoning in the concurrence persuasive.

**17.** On the topic of wrongfulness, we note that in *Bell v. Bell,* 38 Md.App. 10, 379 A.2d 419 (1977), this Court considered whether a threat of civil litigation was "wrongful" for purposes of the contract defense of duress. In that case, a wife sued to set aside a property and settlement agreement, on the ground that she signed it under duress. She alleged that she had only signed the agreement because her husband had threatened to make public an affair she was having with a police lieutenant if she did not accept the terms he was insisting upon.

One element of duress is "[a] wrongful act or threat by the opposite party to the transaction...." *Meredith v. Talbot County,* 80 Md.App. 174, 183, 560 A.2d 599 (1989) (quoting *Food Fair Stores, Inc. v. Joy,* 283 Md. 205, 217, 389 A.2d 874 (1978)). The circuit court construed the husband's remark as a threat to institute a divorce action on the ground of adultery. The other element of duress is "a state of mind in which the complaining party was overwhelmed by fear and precluded from using free will or judgment." *Id.* The court concluded that, notwithstanding the husband's threat, the wife entered into the agreement by her own free will.

On appeal, this Court affirmed. After observing that there were no Maryland cases addressing whether a threat to institute a civil action could be wrongful for purposes of a duress defense, we looked to law from other jurisdictions, and held:

"[An] act done or threatened may be wrongful even though not unlawful, per se; and that the threat to institute legal proceedings, criminal or civil, which might be justifiable, per se, becomes wrongful within the meaning of this rule if made with the corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of such proceedings."

*Id.* at 17, 379 A.2d 419 (quoting *Link v. Link,* 278 N.C. 181, 194, 179 S.E.2d 697 (1971)). We concluded, however, that, while the evidence before the trial court was legally sufficient to support a claim of duress, the record supported the trial judge's factual finding that the husband's conduct did not deprive the wife of her free will.

*Bell* stands for the proposition that in certain situations a threat to reveal information in a lawsuit, when a lawsuit is a lawful vehicle to resolve the parties' dispute, can negate an agreement the parties reached on the subject matter of the dispute, if the threat deprived the other party of the free will to enter into an agreement. *Bell, supra,* 38 Md.App. at 17–18, 379 A.2d 419.

The elements of extortion by writing, under CL section 3–706, are that the defendant, 1) with the intent to unlawfully extort property, 2) knowingly send or deliver "a writing threatening to" reveal incriminating or disreputable information about the victim (*i.e.,* blackmail), or to physically, emotionally, or economically injure the victim, or to harm his property. An unlawful extortion of property is the attainment of property for a wrongful purpose by a wrongful means. Thus, to prove an intent to unlawfully extort property, the State must show that the defendant intended to achieve a wrongful purpose by a wrongful means. For the reasons we have discussed above, litigation is not a wrongful means.

For the same reasons, a threat to sue, even when made in bad faith, is not a threat to inflict economic harm. If the threat is carried out, the claim will be decided in the civil justice system. If the claim is decided on its facts, by a court or jury, and is found to have merit, then any damages awarded to the plaintiff who "threatened" to bring suit to begin with is compensation due, not an injury to the defendant. If a court decides the claim has no legal merit, the court will dispose of it. If the claim is factually false, and was pursued in bad faith, the process of discovery and trial should make that known; and the court has tools available to it, such as Rule 1–341 sanctions, to compensate the defendant for economic harm that the plaintiff's pursuit of the claim caused. Likewise, as the court in *Pendergraft* observed, in some instances, a civil action for abuse of process or malicious prosecution would lie.

Because the facts in evidence could not, as a matter of law, support any reasonable finding that Rendelman's Letter constituted extortion under CL sections 3–701 or 3–706, his convictions cannot be sustained.

**JUDGMENTS REVERSED. COSTS TO BE PAID BY MONTGOMERY COUNTY.**