— A.2d —

**STATE of Maryland**

v.

**Scott L. RENDELMAN.**

**No. 74, Sept. Term, 2007.**

Court of Appeals of Maryland.

May 9, 2008.

Brian S. Klein, Asst. Atty. General (Douglas F. Gansler, Atty. General, Baltimore) on brief, for Petitioner/Cross–Respondent.

Karen C. Daly, Assigned Public Defender (Dechert LLP, Philadelphia, PA) on brief, for Respondent/Cross–Petitioner.

Argued before BELL, C.J., HARRELL, GREENE, JOHN C. ELDRIDGE (Retired, Specially Assigned), LAWRENCE F. RODOWSKY (Retired, Specially Assigned), ALAN M. WILNER (Retired, Specially Assigned) DALE R. CATHELL (Retired, Specially Assigned), JJ.

GREENE, Judge.

On November 1, 2005, a jury in the Circuit Court for Montgomery County convicted Respondent Scott L. Rendelman of one count of extortion and one count of extortion by written threat. Respondent had mailed a letter to William Elmhirst wherein he accused Mr. Elmhirst of stealing $22,000.00 from him and demanded damages plus interest compounded at nine percent. Respondent also threatened to sue Mr. Elmhirst for this amount if Mr. Elmhirst did not pay Respondent a $100,000.00 "settlement demand."

The Court of Special Appeals reversed Respondent's convictions on the grounds of insufficiency of the evidence. *See Rendelman v. State,* 175 Md.App. 422, 927 A.2d 468 (2007). Thereafter, the State of Maryland filed a petition for writ of

certiorari, to which Respondent filed an answer and conditional cross-petition. This Court granted both petitions, *State v. Rendelman*, 402 Md. 37, 935 A.2d 406 (2007), to consider the following three questions:

1. Did the Court of Special Appeals err in holding that the evidence presented by the State did not support Rendelman's convictions of extortion and extortion by written threat?

2. Did the trial court err in admitting into evidence redacted versions of Rendelman's threatening letters as evidence of prior bad acts relevant to establishing Rendelman's intent and demonstrating a common scheme or plan?

3. Did the trial court err in denying Rendelman's request to instruct the jury on "the use of foul language?"

As to the first question, we shall hold, as a matter of law, that threats of litigation, regardless of merit, do not constitute "wrongful threats of economic injury," within the scope of Md.Code (2002), § 3–701 of the Criminal Law Article. In addition, we shall hold that threats of litigation, regardless of merit, do not constitute "unlawful extortion" within the meaning of Md.Code (2002, 2005 Repl.Vol.), § 3–706 of the Criminal Law Article. Because of our resolution of question one, we need not address questions two and three.

## I.

### FACTUAL BACKGROUND

The underlying basis for Respondent's convictions for extortion and extortion by written threat is a letter dated December 22, 2004, addressed to Mr. Elmhirst and copied to Kevin Fay, Esquire, Mr. Elmhirst's attorney. Before we set forth the contents of that letter, we shall briefly summarize the series of events leading to Respondent's writing of the letter.

From 1981 to 1984, Respondent was employed as the bookkeeper for Mr. Elmhirst's company, Solarquest. Respondent was primarily responsible for paying the company's bills and

reconciling the company's accounting books. In late 1984, Mr. Fay discovered that Respondent had embezzled $246,000.00 from Solarquest. In response, Mr. Elmhirst and Mr. Fay reported the theft to the authorities, sought criminal charges against Respondent, filed a civil action for conversion against Respondent, and immediately terminated Respondent from his position with Solarquest. Soon thereafter, Respondent wrote Mr. Elmhirst a long, conciliatory letter, admitting that he had taken the money, explaining what he had done with the funds, and promising to assign the notes and mortgages purchased with the funds to Mr. Elmhirst. Sometime thereafter, Respondent began sending Mr. Elmhirst a series of crude and accusatory letters.

On September 10, 1986, Respondent was tried and convicted of 15 counts of theft relating to his embezzlement of Solarquest funds. He was sentenced to 10 years' incarceration, all but 18 months suspended, and three years' supervised probation. After his conviction and until 1988, Respondent sent Mr. Elmhirst seventeen hate-filled, vulgar letters. In these letters, Respondent blamed Mr. Elmhirst for the consequences of his convictions, including his divorce from his wife and his estrangement from his children. In addition, in some letters, Respondent claimed Mr. Elmhirst owed him $20,000.00. The letters, however, stopped in March 1988 when Respondent was released from State custody and transferred into federal custody to begin serving a federal sentence.[1] He was released from federal custody on December 21, 2001. Respondent waited until December 22, 2004, to send Mr. Elmhirst another letter. It appears he waited until his three-year period of supervised probation was terminated before resuming his letter-writing campaign against Mr. Elmhirst.

The December 22, 2004, letter is typed and bears a letterhead with Respondent's name and an address in Sacramento, California.

---

1. Rendelman was prosecuted and convicted in federal court of writing threatening letters to Mr. Elmhirst as well as several appellate judges.

Respondent's letter to Mr. Elmhirst reads as follows:[2]

William K. Elmhirst, you filthy [expletives],

I've waited 20 years to write this letter. It was December 24, 1984, almost exactly 20 years ago, when you froze my bank accounts, ruined my Christmas with my family, and started the process that would put me in prison for 17 years. You're a [expletives] piece of dog [expletive]. Thanks to you, my kids grew up without a father and my wife (or should I say my ex-wife) is a widow. [Expletives] I hate your guts. You will *NEVER* be able to give me back my lost years, return me to father my 6 and 2 year old kids, or give me back my wife. My life is ruined and it's all your doing. You made false claims against me, stole my money, and you don't give a [expletive]. The only thing you could do is give me back my money. That won't make everything right again, but it's the best you can do. It's the only thing you can do.

I was released on December 21, 2001, and I've been on three years parole. During that time I was not allowed to contact you, I was not allowed to travel, and I couldn't change my residence. But now I am off of parole. Now there is nothing stopping me from coming back there. **NOTHING!!** You stole about $22,000 from me. It was actually a little more, and yes, I still have the exact amount in my records which have been sent to a third party who has kept them for me all these years. I can look it up if it becomes necessary, but for the purpose of settlement, let's just say it was $22,000. Twenty years at 9% compounded interest makes the current amount due $123,297.04. I will settle for $100,000 even. This is the amount I want. You give me back my money, and I swear, you will never see or hear from me again. I will take the money and leave this stinking [expletive] country and the United [expletive] States can kiss my [expletive] goodbye. This country

2. Respondent employed very colorful language in this letter to Mr. Elmhirst. We have taken the liberty of redacting the profanity contained in the letter.

breaks up families, puts innocent people in prison without fair trials, and no one cares. Well, [expletive] all you people. This is the wrong country to marry in and raise a family in. My son is in the army and is in Iraq and the government will probably have him killed and I never knew him beyond the age of 6 years old. [Expletive] all of you. Give me my money and I'm gone.

But if you don't give me my money, I swear, I will come back there and I will knock on your front door. I will demand my money, and if you refuse, I will sue you, and I will sue you for the entire $123,297.04. I will make your remaining years of your life miserable. I will sue you, I will file liens on your property, I will have the sheriff seize your assets. Don't think the statute of limitations will help you. I remember from my legal research that the time of the statute of limitations is tolled while I am involuntarily out of the state, and I have been involuntarily out of the State of [expletive] Maryland since 1988. The statute didn't start running again until today. The way I figure, I still have another year to file on you, but I'm not going to wait that long. I will give you one, maybe two months, and if I don't have my money back, I will come back. I will quit my dead end job and move out of my one room studio and I will come back. I will find you. If I have to hunt for you door to door, I will find you, and when I find you, I will sue you. How old are you now, about 76? 77? I don't even know if you're still alive, but if you are, I **WILL** find you. If you're dead, I will search for your heirs, and when I find them, I will demand my money from them, because they did not inherit your money. It was *MINE!!!!* I will demand my money from them, and if they refuse, I will sue them. I will sue them and get my money, and then I will leave this stinking country and never come back. [Expletives].

I want my money sent to me at the above address. If I do not hear from you, I will return. I will come to your house and look you in the eye. Don't think this is over. Far from it. It's just starting. All these years, you got away with it because I was locked up. I lost cases because

I could not print copies of my appeal brief, I could not research State of [expletive] Maryland issues in federal prisons on the other side of the [expletive] country, and I did not have access to my records. Well, all that changes. Now, you will never again win a case by my default. I will prosecute all my cases fully and to the end. You will not win by default. You will either give me back my money, or you will spend at least as much in legal fees trying to illegally keep it. Either way, God will not let you profit from what you did to me and my family. [Expletives]. How can you sleep at night and look yourself in the mirror in the morning? ? ? You don't care. You ruined a man's life for what was a puny $22,000 which made no difference in your lifestyle at all. You did it just for the fun of it, didn't you? ? I stole nothing from you. *YOU* are the thief. *YOU* are the menace to society. Its [sic] people like you who make society the shit that it is. You break up families and [expletives].

You [expletive]. All you had to do was come to my sentencing and say a few words on my behalf like Kevin P. [expletive] Fay said you would do to get me to settle the civil suit with you. If you had done it, you would never have heard from me again. But you didn't, and you cost me 20 years of my life. Now, it's not over. Now I want my money back, and if you don't give it to me, I will make you wish you had come to my sentencing like you promised. I will sue you, I will file liens on your house and Solarquest property, and I will have the sheriff seize your assets. You will pay. You will pay $100,000 or your remaining years will be spent paying legal fees and going to court when I sue you for $123,297.04.

By the way, Merry [expletive] Christmas you [expletives].

I'm sending a copy of this letter to Kevin Fay. I may sue him too for being a [expletive] piece of [expletive].

Mr. Elmhirst never received this or subsequent letters as he

had moved to England prior to their transmittal.[3] Mr. Fay, however, received the copies directed to him and brought them to the attention of the law enforcement authorities.

On June 17, 2005, Respondent was indicted on four counts of extortion and four counts of extortion by written threat. Four of the eight counts (two counts each of extortion and extortion by written threat) concerned the letter Respondent sent to Mr. Elmhirst (and copied to Mr. Fay) on or about December 22, 2004. The other four counts concerned two letters from Respondent and received by Mr. Fay, dated February 8, 2005, and March 14, 2005. A jury trial was held on October 31 and November 1, 2005. The State called Mr. Fay and his receptionist as witnesses. Respondent offered no evidence.

After deliberation, the jury found Respondent guilty of one count of extortion and one count of extortion by written threat relating to the letter, dated December 22, 2004, sent to Mr. Elmhirst. The jury acquitted Respondent of the six remaining counts. Respondent filed a timely appeal to the Court of Special Appeals.

On July 6, 2007, the intermediate appellate court reversed the convictions, holding that there was insufficient evidence to support the two convictions. *Rendelman*, 175 Md.App. at 449, 927 A.2d at 484. Specifically, the court determined that to be convicted of extortion, the defendant must both intend to achieve a wrongful goal and attempt to do so by a wrongful means. *Id.* at 438, 927 A.2d at 477. The court noted that the evidence the State presented at trial was sufficient to prove that Respondent's goal, to obtain money he was not entitled to, was wrongful. *Id.* at 443, 927 A.2d at 480. The intermediate appellate court, however, concluded that the evidence presented was insufficient to prove that Respondent attempted to accomplish this goal by wrongful means. *Id.* at 444, 449, 927 A.2d at 480, 484. The court held that threats of litigation,

---

**3.** On February 8, 2005, Respondent wrote another letter rife with vulgarities to Elmhirst, also copied to Fay. On March 14, 2005, Respondent wrote directly to Fay.

even if made in bad faith, are not a wrongful means under Maryland statutory language. *Id.* at 448, 927 A.2d at 483. The court explained:

> [A] threat to bring civil litigation does not have intrinsic extortionate value. The threat is to place the extortionist's claim against the victim in the hands of a neutral third party, the civil justice system, to decide. The threat is not such as to instill fear because, if it is carried out, the extortionist no longer has the power to affect its result. Without the capacity to instill fear, the threat, in and of itself, does not have the force to leverage payment of value from the victim merely to avoid a consequence.

*Rendelman,* 175 Md.App. at 446, 927 A.2d at 481–82.

## II.

### *STATUTORY PROVISIONS*

We are called upon to determine what the Maryland General Assembly intended when it enacted two statutes. The statutory provisions with which we are concerned are §§ 3–701 [4] and 3–706 [5] of the Maryland Criminal Law Article.[6]

Section 3–701, entitled "Extortion generally," reads in its entirety: [7]

---

4. Md.Code (2002).

5. Md.Code (2002, 2005 Suppl. Vol.)

6. For a complete summary of the evolution of Maryland law prohibiting extortion, *see Rendelman,* 175 Md.App. at 433–37, 927 A.2d at 474–476.

7. Section 3–701 was substantively amended in 2007, subsequent to the charges filed in this case. *See* Chapters 340 and 341, Acts 2007 (effective October 1, 2007). In 2006, the legislature enacted Senate Bill 606, entitled "Human Trafficking, Extortion, and Involuntary Servitude," which, among other things, expanded the crime of extortion to include a prohibition against obtaining (or conspiring to obtain) labor or services of another person by wrongful consent through actual or threatened destruction, concealment, removal, confiscation, or possession of any immigration or government identification document with intent to harm the immigration status. Section 3–701 now reads:
 (b) A person may not obtain or, attempt to obtain, or conspire to obtain money, property, labor, services, or anything of value from

(a) *Scope of section.*—This section does not apply to legitimate efforts by employees or their representatives to obtain certain wages, hours, or working conditions.

(b) *Obtaining, attempting or conspiring to obtain property prohibited.*—A person may not obtain or attempt to obtain money, property, or anything of value from another person with the person's consent, if the consent is induced by wrongful use of actual or threatened force or violence, or by wrongful threat of economic injury.

(c) *Penalty—Value of property $500 or more.*—If the value of the property is $500 or more, a person who violates this section is guilty of the felony of extortion and on conviction is subject to imprisonment not exceeding 10 years or a fine not exceeding $5,000 or both.

(d) *Penalty—Value of property less than $500.* If the value of the property is less than $500, a person who violates this section is guilty of the misdemeanor of extortion and on conviction is subject to imprisonment not exceeding 18 months or a fine not exceeding $500 or both.

(e) *Limitation.*—A prosecution for a felony under this section shall be instituted within 5 years after the crime was committed.

Section 3–706, entitled "Extortion by written threat," provides:

(a) *Scope of Section.*—(1) This section applies to any writing, whether or not the writing is signed, or if the writing is signed, whether or not it is signed with a fictitious name or any other mark or designation.

(2) This section does not apply to a good faith reasonable notice of dishonor and warning of criminal prosecution

---

another person with the person's consent, if the consent is induced by wrongful use of actual or threatened:
(1) force or violence;
(2) economic injury; or
(3) destruction, concealment, removal, confiscation, or possession of any immigration or government identification document with intent to harm the immigration status of another person.

under Title 8, Subtitle 1 of this article given by a holder of an instrument to the maker of the instrument.

(b) *Prohibited.*—A person, with the intent to unlawfully extort money, property, or anything of value from another, may not knowingly send or deliver, or make for the purpose of being sent or delivered and part with the possession of, a writing threatening to:

(1) accuse any person of a crime or of anything that, if true, would bring the person into contempt or disrepute; or

(2) (i) cause physical injury to a person;

(ii) inflict emotional distress on a person;

(iii) cause economic damage to a person; or

(iv) cause damage to the property of a person.

(c) *Penalty.*—A person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 10 years or a fine not exceeding $10,000, or both.

## III.

### *PARTIES' CONTENTIONS*

#### The State

The State contends that the Court of Special Appeals erred when it held that the evidence presented at trial against Respondent did not support his convictions for extortion. The State maintains that the Court of Special Appeals should not have resolved the case as a matter of law and should not have "substituted its judgment for that of a properly-instructed jury." The State argues further that the intermediate appellate court erroneously adopted an "inflexible per se rule," and "purports to base its decision on settled authority [when] there is by no means a consensus" among other jurisdictions as to what constitutes extortion.

In addition, the State contends that while there are no Maryland appellate cases which have interpreted the phrase "wrongful threat of economic injury," found in § 3–701, the

clear intent of the Maryland legislature "was that the extortion laws cover the widest range of conduct, including, as implicated in the present case, threats of economic harm." The State asserts that "there is nothing in the history or text of Maryland's extortion statutes that suggests that threats of litigation, where the threats are unjustified or wrongful, may not be considered extortionate." According to the State, the statutes carve out only two types of threats that will not support a charge of extortion—(1) demands to "obtain certain wage, hours, or working conditions," *see* § 3–701(a); and, (2) demands relating to bad checks, *see* § 3–706(a).

Further, the State argues that while the intermediate appellate court purported to rely on "a clear majority of the federal courts" in its holding, there is actually a split among the federal circuits as to whether bad faith threats of litigation amount to wrongful threats of economic harm. Specifically, the State cites *Sosa v. DIRECTV, Inc.,* 437 F.3d 923, 939–40 (9th Cir.2006), and *United States v. Sturm,* 870 F.2d 769, 774 (1st Cir.1989), as examples. The State also cites a flurry of cases to argue that the issue of wrongfulness of a threat should be left to the trier of fact—*United States v. Kattar,* 840 F.2d 118, 123 (1st Cir.1988); *Sturm,* 870 F.2d at 774; *United States v. Hyde,* 448 F.2d 815, 833 (5th Cir.1971); *State v. Ashley,* 108 N.M. 343, 772 P.2d 377, 381 (1989); and, *State v. Roth,* 289 N.J.Super. 152, 673 A.2d 285, 290 (App.Div.1996). The State explains: "the per se rule adopted by the Court of Special Appeals is unwarranted and creates a loophole in the law of extortion by permitting potential blackmailers to evade prosecution simply by couching their threats in the form of a threatened lawsuit."

Finally, the State contends that the Court of Special Appeals erred in treating Respondent's letter dated December 22, 2004, to Mr. Elmhirst as a usual and customary demand letter. According to the State, Respondent "had no colorable cause of action for damages against [Mr.] Elmhirst.... The evidence before the jury showed Respondent sought to exact revenge against Mr. Elmhirst and Mr. Fay, whom Rendelman believes unfairly accused him of embezzlement years before."

In other words, the State asks this Court to respect the jury's decision to convict Respondent for extortion: "In this case, the jury reasonably concluded that Respondent's vulgar, obnoxious, threats to sue, file liens, seize assets, and to make the remaining years of the victims' lives miserable, where the evidence showed that Respondent had no legitimate claim to anything, amounted to a wrongful threat of economic injury."

## Respondent

Respondent argues that the evidence presented at trial does not support his convictions for extortion by threat of economic harm. Specifically, Respondent contends that his conduct was not prohibited by the statutes under which he was convicted. He states: "The statutory language and legislative history require that threats be unlawful, or at a minimum wrongful, in order to be chargeable as extortion. Maryland cases and cases from other jurisdictions are united in holding that threats to take legal action, no matter how frivolous or unwarranted, are not wrongful or unlawful and thus cannot support an extortion conviction premised on a threat to cause economic harm."

Respondent contends that "neither the [statutory] text nor the legislative history of Maryland extortion statutes support a conviction based on a threat to take legal action." Rather, Respondent asserts that the statutes criminalize "wrongful" threats made with "unlawful" intent. According to Respondent, "a threat to resort to legal process is the antithesis of the wrongful and unlawful conduct proscribed by Maryland's extortion laws" and he points out that the intermediate appellate court once generally noted that under Maryland law, "threats to institute civil proceedings are not wrongful." *See Bell v. Bell,* 38 Md.App. 10, 17, 379 A.2d 419, 423 (1977).

## IV.

To assess whether any rational trier of fact could have found the essential elements of the crimes of extortion and extortion by written threat beyond a reasonable doubt, we view the evidence in the light most favorable to the prosecu-

tion. *See Harrison v. State*, 382 Md. 477, 487–88, 855 A.2d 1220, 1226 (2004). At trial, the State essentially presented the following evidence: In late 1984, Mr. Elmhirst and Mr. Fay learned that Respondent had embezzled $246,000.00 from Solarquest, a company owned by Mr. Elmhirst, during the three years Respondent was employed by the company. On December 20, 1984, Respondent wrote Mr. Elmhirst a lengthy letter wherein he admitted taking the money and attached, as reimbursement, a check for $93,496.50. He also promised to assign to Mr. Elmhirst three notes he acquired using the embezzled money. Mr. Elmhirst immediately terminated Respondent from employment with Solarquest and filed criminal charges and a civil action for conversion against Respondent. On September 10, 1986, Respondent was convicted in the Circuit Court for Montgomery County of 15 counts of felony theft relating to his embezzlement of funds from Solarquest. Thereafter, at various times from 1985 through 2004, Respondent sent letters to Mr. Elmhirst and Mr. Fay explaining his hatred for the two men for their perceived role in his criminal convictions and subsequent incarceration.

On or about December 22, 2004, Respondent sent Mr. Elmhirst a letter, which the State used as its basis for two of the eight criminal charges against Respondent. It appears Respondent waited until his probation terminated before writing to Mr. Elmhirst, apparently to avoid violating the terms of his probation. In the letter, Respondent blamed Mr. Elmhirst for the consequences that followed his criminal convictions. He also accused Mr. Elmhirst of stealing "about $22,000" from him. The letter, however, does not specify when or how Mr. Elmhirst stole the money from Respondent. Respondent claimed that, with nine percent compounded interest upon the $22,000.00, Mr. Elmhirst owed him $123,297.04, as of the date of the letter. Respondent, however, asserted that he would "settle for $100,000 even." Respondent then delineated the consequences to Mr. Elmhirst if Mr. Elmhirst chose not to meet the settlement demand: "I will sue you, I will file liens on your house and Solarquest property, and I will have the sheriff seize your assets. You will pay. You will pay $100,000

or your remaining years will be spent paying legal fees and going to court when I sue you for $123,297.04."

██ The Court of Special Appeals concluded that Respondent's damage claim was "bogus" and that "there was no factual basis for any assertion he made, at any time, that Mr. Elmhirst owed Respondent money." Regardless of that characterization of the legal merits of Respondent's claims against Mr. Elmhirst, we agree with the intermediate appellate court that "a threat to file suit unless a settlement is paid, even when made in bad faith, is not a 'wrongful' threat" within the meaning of the extortion statutes. *Rendelman,* 175 Md.App. at 444, 927 A.2d at 480. We assume *arguendo,* for the purposes of our discussion, that Respondent's threats were made in bad faith and without any legal merit. Nevertheless, his threat to file suit and his demand to be paid $100,000.00 do not, as a matter of law, constitute a "wrongful threat of economic injury" within the meaning of § 3–701 or an unlawful extortion of money within the meaning of § 3–706.

## V.

### *ANALYSIS*

### Section 3–701

██ A threat to pursue a legal action unless a settlement payment is rendered is not extortion by *wrongful* threat of economic damage under § 3–701. In *Leppo v. State Highway Admin.,* 330 Md. 416, 422, 624 A.2d 539, 542 (1993), we restated our well-established precedent for interpreting statutes:

> When a court is engaged in the divination of legislative "intent," the key is the purpose of the legislation, determined in the light of the statute's language and context. *Kaczorowski v. City of Baltimore,* 309 Md. 505, 516, 525 A.2d 628 (1987). When we look at the statutory language we apply the plain meaning of the words chosen by the Legislature. *Scheve v. Shudder,* 328 Md. 363, 371–372, 614 A.2d 582 (1992); *Revis v. Automobile Ins. Fund,* 322 Md.

683, 686, 589 A.2d 483 (1991). If the statutory language itself is insufficient to lead us comfortably to conclude what the Legislature intended, we look beyond the words and examine legislative history when it is available and the context of the legislation. *Warfield v. State,* 315 Md. 474, 499–500, 554 A.2d 1238 (1989).

Considering the ordinary use of the English language, we find the text of § 3–701 to be clear and unambiguous and supportive of Respondent's position. Section 3–701 explicitly prohibits an individual from obtaining or attempting to obtain anything of value (including money and property) from another individual with that individual's consent by, among other things, a *"wrongful* **threat of economic injury."** It is without a doubt that Respondent's threat of a civil suit against Mr. Elmhirst was a threat to inflict economic injury. Respondent made it abundantly clear that if Mr. Elmhirst did not tender $100,000.00 to Respondent, Mr. Elmhirst would be, among other things, spending his "remaining years . . . paying legal fees."

The question, however, remains whether Respondent's threats can be viewed as "wrongful" with the meaning of § 3–701. Unfortunately, Title 7 of the Criminal Law Article does not offer a definition of the relevant terms of § 3–701. In addition, there are no reported Maryland appellate cases interpreting or applying the phrase "wrongful threat of economic injury."

Nevertheless, we may discern the meaning of "wrongful" within the meaning of § 3–701. *See Kushell v. Department of Natural Resources,* 385 Md. 563, 576–78, 870 A.2d 186, 193–94 (2005) ("Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology."). In the ordinary understanding of the English language, "wrongful" is generally defined as "contrary to law" or "unlawful." *See* BLACK'S LAW DICTIONARY (8th ed.1999). *See also* Garner, A DICTIONARY OF MODERN LEGAL USAGE (2nd ed.1995) (defining "wrongful" as "characterized by unfairness or injus-

tice; contrary to law"); WEBSTER'S II NEW COLLEGE DICTIO-
NARY (3rd ed.2002) (defining "wrongful" as "wrong," "unjust,"
or "unlawful"). In determining whether an individual's con-
duct is "contrary to law" or "unlawful," we look to Maryland
law governing the conduct. Specifically, in this case, we look
to Maryland law governing an individual's pursuit of frivolous
civil litigation.[8] If, upon examining the law, we find that an
individual retains a lawful right to engage in certain conduct, a
threat to engage in that conduct unless a payment is made
cannot constitute extortion under Maryland law. In other
words, if Respondent were subject to criminal penalties for
engaging in frivolous litigation, then a threat to resort to
meritless legal process reasonably could be considered wrong-
ful under the statute.

 In examining Maryland law governing the initiation
and/or pursuit of civil actions, it is apparent that there are no
criminal sanctions for the filing of frivolous civil actions.[9]

---

8. Our procedure for determining whether an action is "unlawful" or
"contrary to law" is supported by the test put forth by Professor Stuart
P. Green of Louisiana State University Law Center in *Theft by Coercion:
Extortion, Blackmail, and Hard Bargaining*, 44 Washburn L.J. 553,
573 –74 (2005). Professor Green contends that "we should understand
extortion to be limited to those threats to engage in conduct that is in
fact unlawful." *Id.* at 572. In determining what is unlawful, Professor
Green suggests that "we should look to the relevant law governing the
conduct threatened" in order to deduce whether a threat of economic
injury is unlawful. *Id.*

9. There are, however, several "extraordinary" civil remedies for frivo-
lous lawsuits, including Maryland Rule 1–341 and the torts of abuse of
process and malicious use of process. Maryland Rule 1–341, for
instance, permits a court to award one party the costs of the proceed-
ing(s) as well as reasonable expenses and attorney's fees if "the court
finds that the conduct of the [offending] party in maintaining or
defending any proceeding was in bad faith or without substantial
justification." Md. Rule 1–341 (2008).

The tort of abuse of process occurs when a party has "wilfully
misused criminal or civil process" against another party for a purpose
different than the proceeding's intended purpose and thereby caused
that party damage (e.g., arrest, seizure of property, economic injury).
*Krashes v. White*, 275 Md. 549, 555, 341 A.2d 798, 802 (1975); *see also
One Thousand Fleet Ltd. Partnership v. Guerriero*, 346 Md. 29, 694 A.2d
952 (1997).

Because the pursuit of a civil action, regardless of merit, is not an unlawful act under Maryland law, we are constrained to hold that a threat to litigate a meritless cause of action does not constitute a "wrongful" act under the Maryland extortion statutes. To render a *threat* of civil action as a potential criminal offense when the actual filing of a meritless civil action is not unlawful will only serve to stifle our judicial system and overwhelm the courts with excessive litigation between feuding parties.

■ In addition, our ruling preserves our judiciary's role as the institution created specifically to redress wrongs and/or grievances and enforce rights between individuals or entities in a fair and lawful matter. Civil actions, regardless of their merit, are a "lawful means for people to have their private disputes, including financial disputes, decided when they are unable to decide them on their own." *Rendelman,* 175 Md. App. at 444, 927 A.2d at 481. We want individuals to utilize the court system to resolve their disputes instead of employing "rough justice" techniques, self help measures, or other forms of "street justice." Indeed, we have enacted, within the Maryland Rules, many rules of civil procedure to govern the basic conduct of litigants and attorneys through the course of litigation to ensure our system of justice is both fair and just in procedure and result. To criminalize an individual's attempt, such as in this case, to resolve a perceived dispute

---

Malicious use of process, on the other hand, is the initiation or continuation "of a civil proceeding against another with malice and without probable cause" that causes damage to and ends in favor of the other party. *One Thousand Fleet Ltd. Partnership,* 346 Md. at 34, 694 A.2d at 954.

The existence of these remedies, however, does not control our analysis in this matter as the civil consequences of a given conduct cannot render that conduct unlawful.

In addition, the mere threat of the initiation of meritless or frivolous litigation would not rise to the level of any of these civil consequences. Rather, these civil consequences require the *actual* pursuit of litigation to be applicable. In the case *sub judice,* there was no actual initiation of litigation by Respondent against Mr. Elmhirst. Respondent only threatened to sue Mr. Elmhirst if Mr. Elmhirst did not tender a $100,000.00 payment. Respondent never followed through on his threat of civil action.

would only serve to disrupt our system of justice. Indeed, we share the views expressed by the United States Court of Appeals for the Eleventh Circuit:

> [W]e are troubled by any use of this [ ] criminal statute to punish civil litigants. Sanctions for filing lawsuits ... lead to collateral disputes and a 'a piling of litigation on litigation without end.' Allowing litigants to be charged with extortion would open yet another collateral way for litigants to attack one another. The reality is that litigating parties often accuse each other of bad faith. The prospect of such civil cases ending as criminal prosecutions gives us pause.

*United States v. Pendergraft*, 297 F.3d 1198, 1207 (2002) (internal citation omitted).

Moreover, our decision is supported by the legislative history of § 3–7 01. That statute appears to be patterned after the Hobbs Act, 18 U.S.C. § 1951 (2000), the federal prohibition against extortion.[10] Looking to the federal jurisdictions that have analyzed this same issue under the statutory language of the Hobbs Act, we note that a majority of the federal jurisdictions have held that a threat to file a law suit unless a settlement demand is accepted, regardless of whether the threat was made in good faith, is not a wrongful threat.[11] *See*

---

**10.** The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear...." 18 U.S.C. § 1951(b)(2).

**11.** The State points out that there are several jurisdictions that have held that threats to initiate meritless litigation may give rise to a violation of the Hobbs Act. *See Sosa v. DIRECTV*, 437 F.3d 923, 939–40 (9th Cir.2006) (holding that threats of litigation may constitute extortion if the threat induces wrongful fear in the individual receiving the threat and the asserted claims rise to the level of a sham); *Hall American Ctr. Assoc. Ltd. P'ship v. Dick*, 726 F.Supp. 1083, 1094 (E.D.Mich.1989) (holding that a threat of litigation is extortion under the Hobbs Act provided the individual making the threat knew he or she was not entitled to obtain the damages demanded); *United States v. Sturm*, 870 F.2d 769, 774 (1st Cir.1989) (noting, hypothetically, that a threat of litigation might constitute extortion under the Hobbs Act where the individual making the threat knew he or she was not entitled to the damages claimed). These cases are not persuasive.

In *Sosa*, DIRECTV sent demand letters to tens of thousands of individuals it believed had accessed DIRECTV's satellite television signal illegally. In these letters, DIRECTV accused the letter recipients of violating a federal criminal statute and threatened civil litigation unless the recipients forfeited their DIRECTV equipment and paid DIRECTV an unspecified sum of money. In response, one letter recipient initiated a civil action against DIRECTV, asserting the letter constituted extortion under the Hobbs Act. The Ninth Circuit held that the letters sent by DIRECTV did not constitute extortion because the letters involved reasonably-based legal claims. While the State claims that the Ninth Circuit's holding suggests that "baseless threats of litigation or threats that amount to a sham may support charges of extortion" under the Hobbs Act, the court's interpretation of "wrongful" is much broader in scope than our interpretation. We read "wrongful" in the Maryland statutes to mean "unlawful" or "contrary to law," while the Ninth Circuit's definition, although not explicitly defined in *Sosa*, clearly includes more than just "unlawful" conduct.

*Hall American Ctr. Assoc. Ltd. P'ship v. Dick, supra*, is factually distinguishable from the case *sub judice*. First, in *Hall American*, the plaintiffs "alleged [in their complaint] that the defendants affected or attempted to affect interstate commerce by extortion." *Id.* at 1094. The defendants moved to dismiss and the court "[v]iewing the allegations as true" examined whether the plaintiffs had sufficiently alleged the predicate acts for a Hobbs Act violation. *Id.* at 1096. Finding the allegations sufficient, the court held that "in the context of a Rule 12(b)(6) motion to dismiss, the plaintiffs' allegations—the defendants filing of lawsuits and notices of lis pendens as part of a scheme to extort . . .—suffice to state a claim under the Hobbs Act." *Id.* at 1097. Thus, the analysis in *Hall American* was merely a search for the minimum necessary allegations to support a viable civil complaint, and not, as here, a review of a criminal conviction.

Second, *Hall American* concerned lawsuits and notices of lis pendens *actually* filed "as part of an extortionate scheme to obtain property." *Id.* at 1097 (emphasis in the original). "The allegations in [the] case [went] further than the simple threat to sue." *Id.* The plaintiffs had alleged in their complaint that the defendants filed lawsuits and notices of lis pendens as part of their scheme to extort desired property owned by the plaintiffs and interfere with the plaintiffs' other business ventures, attempted to involve the United States Attorney in the dispute, and harassed third parties that were involved with the desired property. By contrast, in the instant matter, Respondent did not actually and systematically file suits, but only threatened to file a civil action against Mr. Elmhirst. Additionally, it is doubtful that *Hall American* remains persuasive authority because in 1994, the Sixth Circuit issued its opinion in *Vemco, Inc. v. Camardella*, 23 F.3d 129 (6th Cir.1994), holding that a threat of litigation, even if made in bad faith, does not constitute extortion.

Finally, *United States v. Sturm, supra*, is factually distinguishable and not consistent with our analysis. Sturm was convicted of attempted extortion after demanding $20,000 from a bank for the return of property (logbooks) that legally belonged to the bank. *Id.* at 769–70. Sturm never threatened litigation, but instead refused to turn over

*Pendergraft,* 297 F.3d at 1206; *Deck v. Engineered Laminates,* 349 F.3d 1253, 1258 (10th Cir.2003); *Vemco, Inc. v. Camardella,* 23 F.3d 129, 134 (6th Cir.1994); *First Pacific Bancorp, Inc. v. Bro,* 847 F.2d 542, 547 (9th Cir.1988); *I.S. Joseph Co., Inc. v. J. Lauritzen A/S,* 751 F.2d 265, 267–68 (8th Cir.1984). We believe the analytical framework utilized by these courts is consistent with our interpretation of Maryland's statutory prohibition against extortion.

For example, in *U.S. v. Pendergraft,* 297 F.3d 1198 (11th Cir.2002), the defendant/physician operated an abortion clinic in Marion County, Florida, much to the displeasure of many Marion County residents. Dr. Pendelgraff sued the sheriff's department and the county after they denied his request to hire off-duty police officers to protect the clinic. Dr. Pendelgraff alleged that, in denying his request, the county and the sheriff's department violated certain laws. The county asked the doctor to voluntarily dismiss it from the case, asserting that it had not participated in the sheriff's department's decision to deny the doctor's security request. Dr. Pendelgraff refused to dismiss the county, and instead threatened to amend his complaint to allege that a county official had threatened violence against the clinic, in violation of federal law, as well as to seek actual and punitive damages. In the alternative, Dr. Pendelgraff offered to not amend the complaint if the county would tender a settlement payment. Unbeknownst to Dr. Pendelgraff, the FBI had been investigating Dr. Pendelgraff's conduct with the county and the sheriff's department, including recording telephone calls. The FBI

---

logbooks for a plane the bank had repossessed. *Id.* The logbooks, in conjunction with the plane, were worth approximately $45,000 to the bank. *Id.* at 770. The court vacated Sturm's conviction in part because "the trial court did not instruct the jury that in order to convict the defendant of attempted extortion, it would have to find that Sturm knew that he was not legally entitled to [the $20,000 as a fee] to help [the bank] recover the logbooks." *Id.* at 775. In arriving at this conclusion, the court posited a hypothetical regarding parties to a contract threatening litigation. *Id.* at 774. The hypothetical, as such, is dicta and is not, as the State argues in the present case, a test. In any event, we do not adopt the hypothetical in our analysis.

recordings established conclusively that the county official had not made any threats of violence to the doctor. The doctor was then charged with, among other things, extortion under the Hobbs Act. Dr. Pendelgraff and a business associate were convicted.

The United States Court of Appeals for the Eleventh Circuit reversed the convictions. It held that to prove extortion under the Hobbs Act, the government must establish that the defendant(s) used, or attempted to use, a wrongful means to achieve a wrongful end. The Court relied primarily on the United States Supreme Court's definition of "wrongful" in *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.E.2d 379 (1973). The Court determined that, although the Government had established that the doctor had sought to achieve a wrongful end—to receive money that he was not entitled to—it did not establish that the defendants had used wrongful means. Specifically, the Court held that the means the doctor threatened to employ to receive a settlement payment—that is, civil action—was not wrongful and, therefore, could not constitute extortion. The Court reasoned:

A threat to litigate, by itself, is not necessarily "wrongful" within the meaning of the Hobbs Act. After all, under our system, parties are encouraged to resort to courts for the redress of wrongs and the enforcement of rights. For this reason, litigants may be sanctioned for only the most frivolous of actions. These sanctions include tort actions for malicious prosecution and abuse of process, and in some cases recovery of attorney's fees, but even these remedies are heavily disfavored because they discourage the resort to courts.

History has taught us that, if people take the law into their own hands, an endless cycle of violence can erupt, and we therefore encourage people to take their problems to court. We trust the courts, and their time-tested procedures, to produce reliable results, separating validity from invalidity, honesty from dishonesty. While our process is sometimes expensive, and occasionally inaccurate, we have

confidence in it. When a citizen avails himself of this process, his doing so is not inherently "wrongful."

297 F.3d at 1206–07 (citations omitted). In addition, the Court also expressed hesitation to extend potential criminal sanctions to a threat of litigation made to a government entity. The Court explained: "The right of citizens to petition their government for the redress of grievances is fundamental to our constitutional structure." *Id.* at 1207.

We conclude that a threat of litigation, regardless of the merit of the underlying claim, is not unlawful under Maryland law and, therefore, cannot be considered "wrongful" within the meaning of § 3–701 of the Maryland Criminal Law Article.

### Section 3–706

As the Court of Special Appeals stated in its opinion: "The elements of extortion by writing, under [§ ] 3–706, are that the defendant, 1) with the intent to unlawfully extort property, 2) knowingly send or deliver "a writing threatening to" reveal incriminating or disreputable information about the victim (i.e., blackmail), or to physically, emotionally, or economically injure the victim, or to harm his property." 175 Md.App. at 449, 927 A.2d at 483. In this case, it is undisputed that Respondent "knowingly sent" to Mr. Elmhirst a letter threatening to economically injure Mr. Elmhirst. The defendant, however, must also intend to "unlawfully extort property." In the case *sub judice*, we have held that to undertake the action of extortion, the individual must employ unlawful means to achieve his desired objective. Respondent's only action was to threaten Mr. Elmhirst with civil litigation. As we have stated in this opinion, a threat of litigation is not an unlawful act that would support a conviction for the crime of extortion. Therefore, as a matter of law, the evidence cannot support the conclusion that Respondent intended to employ an unlawful means to extract $100,000.00 from Mr. Elmhirst.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**